[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-11333

_____

D.C. Docket No. 1:16-cr-00407-TCB-JSA-1


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ALPHONSO I. WATERS, JR.,

Defendant-Appellant.


_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(September 10, 2019)

Before ED CARNES, Chief Judge, JULIE CARNES, and CLEVENGER,[*] Circuit
Judges.

ED CARNES, Chief Judge:

_____

[*] Honorable Raymond C. Clevenger, III, United States Circuit Judge for the Federal
Circuit, sitting by designation.

In this wire fraud case, we are once again confronted with the question of when a lie is just a lie and when it is a federal crime. "It is conceded that there is a class of lies, voluntary, aimless, yet weak and wicked lies," Green's Adm'r v. Bryant, 2 Ga. 66, 68 (1847), that our law does not forbid. And the federal wire fraud statute "forbids only schemes to defraud, not schemes to do other wicked things, e.g., schemes to lie, trick, or otherwise deceive." United States v. Takhalov, 827 F.3d 1307, 1310 (11th Cir.), as revised (Oct. 3, 2016), opinion modified on denial of reh'g, 838 F.3d 1168 (11th Cir. 2016). "The difference," we have explained, "is that deceiving does not always involve harming another person; defrauding does." Id.

Alphonso Waters, Jr., relies on that distinction to argue that the lies he told in the process of obtaining a $6 million loan did not amount to fraud. He sought that loan in 2013 from a private lender who discovered that Waters had several years' worth of federal tax liens outstanding. To calm the lender's concerns, Waters sent it a letter that appeared to be from the IRS approving him for a payment plan to pay off the tax liens. Then he sent the lender another letter stating that, as far as he knew, the first letter really was from the IRS. Both of those letters were lies — lock, stock, and barrel; stem to stern, top to bottom. But, Waters argues, they weren't statutorily damned lies; they weren't lies constituting wire fraud because they didn't affect the bargain between the parties. He reasons that

2

any lie he told about his creditworthiness was harmless because the collateral for the loan was worth $8.4 million, which is more than the total amount of the loan. We are not convinced.

## I.  BACKGROUND

### A.  The Scheme

Waters was the CEO of Family Practice of Atlanta, a medical practice he owned and operated with his wife, Dr. Sondi Moore-Waters, a physician.  He ran the business side of things, she ran the medical side.  **[Id.]**  Sometime around 2011 they decided they needed a bigger building for the growing practice.  They formed Sondial Properties, LLC (a portmanteau of the couple's names, Sondi and Al), and the company borrowed about $4 million in the form of two different construction loans from JP Morgan Chase Bank.  Those loans matured on October 18, 2013, and Sondial immediately defaulted on them because of delays and cost overruns with the construction.

Waters sought the help of a commercial mortgage broker in finding a $6 million transitional loan so he could pay back the $4 million to Chase and also finish construction.  Waters' broker, Tony Baldwin, contacted Chesterfield Faring, Ltd., a real estate services and investment firm that specialized in finding funding for lapsing or lapsed loans.  Chesterfield's CEO was a man named Larry Selevan. Selevan and his company helped borrowers find loans by researching the financial

3

viability of a proposed project and packaging that information so potential lenders could easily decide whether to provide financing.

Selevan proposed the loan project to Colony Capital, LLC.  Colony was a private equity firm and real estate investment trust that provided financing for commercial realty projects deemed to exceed a bank's normal risk profile. Michael Sanchez, the senior vice president of Colony, oversaw Sondial's loan application.  He understood that the loan "had to be closed very quickly" so Waters could pay off Chase and meet construction deadlines.  On October 25, 2013, Sanchez sent Chesterfield a term sheet outlining the terms and conditions that Colony proposed for the loan.  Under the proposal Colony would lend Sondial $6 million and, in exchange, it would receive a first priority mortgage on the new building and rights to all leases and rents there, as well as about a 7% interest rate for the two-year initial term.  Al Waters signed the term sheet on behalf of Sondial.

With the terms of the loan all set, the due diligence phase began.  Waters and Moore-Waters filled out a personal financial statement for Colony, listing their assets, income, liabilities, and things of that nature.  To say the least, they weren't as forthcoming as they should have been.  The couple left blank the line asking them about any unpaid income taxes, and they listed "0" as the amount or value of outstanding liens and other "assessments payable."  Truth be told, the couple had nearly half a million dollars of outstanding federal tax liens filed against them.

4

And the truth was told, or at least uncovered, when Colony ran a background check a few weeks later that turned up the tax liens.[1]

As you can imagine, that discovery wrenched the lending process to a halt. When he found out about the liens Sanchez was "very very angry" because it "was an item that absolutely should have been disclosed" earlier in the process.  He saw the lack of disclosure as a "deal killer" because he didn't want "to close a transaction with [those] outstanding liens."  Sanchez explained:

> This [sort of thing] is disclosed up front.  This is something that when you find out during when you run a background check and hear for the first time, that that [sic] is a huge red flag in terms of whether or not, you know, this borrower has been disclosing and been forthright on what his financial condition is.

Selevan, the CEO of Chesterfield, encouraged Sanchez not to walk away from the deal and to work with Waters while they tried to come up with a solution to the tax liens.  Sanchez agreed to wait and see.  He considered the liens a "gating issue" that had to be resolved before the loan could be closed.  Waters' attorney, David Gentry, understood that.  Because he did, on December 13, 2013, he sent the IRS Taxpayer Advocate a letter asking for approval of a payment plan and requesting that the IRS provide "immediate assistance" so Waters could close the loan with Colony by December 18.

---

[1] Those liens were for $32,917.77 from tax year 2007; $37,109.61 from 2008; $68,111.60 from 2009; and $328,656.00 from 2010, for a total of $466,794.98.

Also on December 13, Waters himself called his Congressman's office to ask for help getting the tax liens removed.  The constituent services representative told him that the lien removal process typically took 30–45 days, but that it would take longer for him because the IRS had already closed for the holidays and would not begin processing any new requests until January.  Waters told the representative to send the request to the IRS anyway, which she did.  Paraskevidekatriaphobics would note that December 13 was a Friday.

The following Monday, December 16, Waters emailed Gentry a letter that seemed to be from the IRS.  It was also dated December 16, 2013, and appeared to be on "Department of the Treasury: Internal Revenue Service" letterhead and bore the seal of the IRS Office of the Chief Counsel.  It stated in full:

December 16, 2013

VIA US MAIL AND FACSIMILE

Re: Case No. 5684374

Dear Taxpayers:

We are in receipt of your letter submitted to us by the office of The Honorable Hank Johnson, Member, U.S. House of Representative[s] regarding Case No. 5684374 dated December 13, 2013.

The letter dated December 13, 2013 referencing Financial Hardship — Immediate Assistance needed was a request to expedite your form 433A which was received in our office December 2, 2013.

In accordance with Section 5.14.2.1 your request for Partial Payment Installment Agreement (PPIA) has been approved.    A field

6

representative will contact you in 60–90 days to discuss in further detail the financial agreement.

I hope you find this letter helpful in the resolution of your immediate requirements.  Please maintain copies of this letter for your permanent records.

Sincerely,

Rebecca Langford
District Director

Four minutes after receiving the letter, Gentry forwarded it to Colony's attorney, Beau Baker, and asked if it resolved Colony's concerns.  It did not. Baker worried that the details of the IRS payment plan the letter referred to were months away, while the parties were trying to close the loan in the next couple of weeks.  Sanchez, the senior vice president for Colony, also concluded that the letter was insufficient because it did not contain any specifics of the IRS payment plan.

Then there was the question of authenticity.  After talking with tax experts at his law firm, Baker became concerned that the letter might not really be from the IRS at all.  He did a Google search for "Rebecca Langford District Director" and learned that the IRS had phased out the "District Director" position nine years before, sometime around 2004.  Baker wrote to the IRS to verify the letter, and Tony Baldwin, the initial mortgage broker, asked Waters if he had the contact

7

information for Rebecca Langford.  Waters responded that he did not.

Undeterred, Waters sent this letter to Baldwin, Gentry, and Selevan:

December 30, 2013

RE: IRS Letter

To Whom It May Concern:

To the best of my knowledge the letter from Rebecca Langford IRS District Director and dated December 16 2013 with the subject matter "Partial Payment Installment Agreement" is from Rebecca Langford IRS District Director.

A copy of the letter is attached to this email.  Thank you.

Kind Regards,

Al Waters

Waters' letter didn't appease Colony.  A few days into the new year, in response to an email from Baldwin that the delay in financing was putting Waters "in a very bad position," Sanchez (the Colony VP) emailed Baldwin, Waters, and others working on the deal: "With all due respect, we were not expecting to deal with IRS liens in the hundreds of thousands of dollars with no plan in place.  I am not comfortable with a 'to be determined' plan with no clear documentation." Sanchez later testified that the tax liens were "absolutely critical things to resolve before . . . getting even close to approving this loan for closing."

It turned out, of course, that the IRS letter was "outrageously bogus," as Waters' trial attorney would later put it.  Nobody at the IRS had approved a

8

payment plan for Waters; the IRS Office of Chief Counsel did not have district directors in 2013; and there was no one at the IRS named Rebecca Langford. The letter was as phony as Piltdown Man, although it did not take forty-one years to disprove. Baker soon confirmed that the letter was false, and Colony killed the transaction in January 2014. Waters eventually got a loan from a different lender. That was not all he got.

## B. Trial And Sentencing

Waters also got indicted on two counts of wire fraud in violation of 18 U.S.C. § 1343. One count was for sending the fraudulent IRS letter and the other one was for sending the email stating that letter was authentic. Waters pleaded not guilty and went to trial in November 2017. He moved for a judgment of acquittal at the conclusion of the government's case in chief, arguing that there was insufficient evidence for the jury to find that he had created the fraudulent documents and that, in any event, the deceptive documents were not material to the proposed loan agreement. The district court denied the motion and Waters failed to renew it at the end of his case.

Waters did not testify at trial, but through his counsel he argued to the jury that the prosecution had not proved beyond a reasonable doubt that Waters was responsible for the false IRS letter or that he had intentionally lied in his email about the letter. He also argued that the IRS letter wasn't material to the loan

9

transaction because well into January 2014, a month after the IRS letter had been circulated, the two mortgage brokers (Baldwin and Selevan) tried to find other ways for Waters to pay off the tax liens and make the loan work.

One issue that came up at trial was how to charge the jury on wire fraud. Waters requested a jury instruction on the difference between a scheme to deceive and a scheme to defraud based on this Court's decision in United States v. Takhalov, 827 F.3d 1307, 1312–13 (11th Cir. 2016).  He asked the judge to instruct the jury that: "to defraud, one must intend to use deception to cause some injury; but one can deceive without intending to harm at all"; and "if a Defendant does not intend to harm the victim — to obtain, by deceptive means, something to which the Defendant is not entitled — then he has not intended to defraud the victim."  Doc. 45 at 12 (quoting Takhalov, 827 F.3d at 1312–13).

The government opposed Waters' proposed instruction as unnecessary and incomplete — unnecessary because the case was a "straightforward scheme to defraud," and incomplete because the proposed instruction did not instruct the jurors how to tell if a scheme caused harm or not, which happened only if the lie affected the "nature of the bargain itself."  See Takhalov, 827 F.3d at 1313.

The judge told the parties that he was not inclined to give Waters' proposed instruction, but that if he did give it, he would include an explanation about how to tell if the lie caused harm and affected the nature of the bargain itself.  Waters did

10

not agree to that solution.[2]  The judge then overruled Waters' proposal and gave

the jury a charge based on the pattern instruction, without any language about the

difference between defrauding and deceiving.  See Pattern Crim. Jury Instr. 11th

Cir. OI O51 (2016).[3]  The jury found Waters guilty on both counts of wire fraud.

---

[2]  Here's the exchange:

The Court:  I am not inclined to give [Waters' proposed instruction], but if I did
give it I would add the government's instruction.  How would you feel about that,
Mr. Kish [the attorney for Waters]?

Mr. Kish:  Having never heard this until this moment, the government's instruction,
I would need to look at it.  But my thinking is that the reason I structured my
instruction in the manner in which I did was because it is the essence of the
[Takhalov] decision, it is what the Court said the rule of law was.  All of these
examples —

The Court:  Read the instruction again, the proposed defendant's instruction?

Mr. Kish:  I have just described what is needed to prove a scheme to defraud;
however, quote, there is a difference between deceiving and defrauding.  To
defraud . . . one must intend to use deception to cause some injury.  But one can
deceive . . . without intending to harm at all.  Put another way, one who defrauds
always deceives, but one can deceive without defrauding.  A defendant schemes to
defraud only if he schemes to deprive someone of something of value by trick,
deceit, chicane, or over-reaching. . . .  But if a defendant does not intend to harm
the victim to obtain by deceptive means something to which the defendant is not
entitled, then he has not intended to defraud the victim.  Furthermore, a schemer
who tricks someone into a transaction has not schemed to defraud so long as he
does not intend to harm the person he intends to trick.  And this is so, even if the
transaction would not have occurred but for the trick.  For if there is no intent to
harm, there can only be a scheme to deceive, but not one to defraud.

The Court:  I think that is overly confusing, and the subject is adequately covered
by the charge as given now.  So I respectfully overrule the defendant's request for
inclusion of his proposed charge no. 9.

(Italics omitted.)

[3] This is the charge the district court gave:

It is a federal crime to use interstate wire, radio, or television communications to carry out a scheme to defraud someone else. The defendant can be found guilty of this crime only if all the following facts are proved beyond a reasonable doubt. One, the defendant knowingly devised or participated in a scheme to defraud, or to obtain money or property by using false pretenses, representations, or promises. Two, the false pretenses, representations, or promises were about a material fact. Three, the defendant acted with the intent to defraud. And four, defendant transmitted or caused to be transmitted, by wire or some communication in interstate commerce, to help carry out the scheme to defraud.

The phrase scheme to defraud includes any plan or course of action intended to deceive or cheat someone out of money or property by using false or fraudulent pretenses, representations, or promises. A statement or representation is false or fraudulent if it is about a material fact that the speaker knows is untrue, or makes with reckless indifference to the truth, and makes with the intent to defraud. A statement or representation may be false or fraudulent when it is a half truth, or effectively conceals a material fact, and is made with the intent to defraud.

A material fact is an important fact that a reasonable person would use to decide whether to do or not do something. A fact is material if it has the capacity or natural tendency to influence a person's decision. It doesn't matter whether the decision maker actually relied on the statement or knew or should have known that the statement was false; however, not all misrepresentation or omissions constitute a scheme to defraud. The misrepresentation or omission must be material, and it must be one on which a person of ordinary prudence would rely.

The intent to defraud is the specific intent to deceive or cheat someone, usually for personal financial gain or to cause financial loss to someone else. To prove intent, the government must establish that the defendant believed that the supposed victim would act or refrain from acting in reliance upon that representation. The government does not have to prove all of the details alleged in the indictment about the precise nature and purpose of the scheme. It also doesn't have to prove that the material transmitted by interstate wire was itself false or fraudulent, or that using the wire was intended as the specific or exclusive means of carrying out the alleged fraud, or that the defendant personally made the transmission over the wire, and it doesn't have to prove that the alleged scheme actually succeeded in defrauding anyone.

12

Before sentencing, the probation office prepared a presentence report and recommended the application of an 18-level enhancement under U.S.S.G. § 2B1.1(b)(1)(J) for an intended loss amount of more than $3.5 million but less than $9.5 million. That would have made Waters' total offense level 25 and his guidelines range 57 to 71 months in prison. Waters objected to the enhancement on the basis that there was no actual or intended loss. He pointed out that the building, which was to serve as collateral for the loan, had been appraised in April 2014 to be worth $8.4 million, $2.4 million more than the amount of the proposed loan from Colony. The government agreed that this meant the enhancement should not apply. That concession brought Waters' guidelines range down to zero to six months, and the district court sentenced him to six months in prison and one year of supervised release.

Waters appeals his convictions and sentence.[4]

## II. THE TAKHALOV ISSUES

Waters contends that the district court abused its discretion by not giving his proposed jury instruction on the difference between fraud and deceit. He also contends that there was insufficient evidence for the jury to find him guilty of wire fraud because the government did not show that he intended to harm Colony. Both contentions rely on our decision in Takhalov. Since that case came out, a judge of

---

[4] Waters is currently out on bond and has not begun serving his sentence.

our Court has questioned some of the statements in that opinion.  See United States

v. Feldman, 931 F.3d 1245, 1265–74 (11th Cir. 2019) (W. Pryor, J., concurring).

We need not get into that here.  Even assuming that every statement in our

Takhalov opinion is correct, this case is distinguishable.

## A.  The Takhalov Case

The federal wire fraud statute makes criminal any "scheme or artifice to

defraud."  18 U.S.C. § 1343.  The statute does not define what that is, but we have.

See United States v. Bradley, 644 F.3d 1213, 1239–40 (11th Cir. 2011).  And one

thing we've recognized, tautologically perhaps, is that to be convicted under the

§ 1343 fraud statute a defendant's "scheme must be a scheme to defraud rather

than to do something other than defraud."  Takhalov, 827 F.3d at 1312. What is

essential to a scheme to defraud is a question we confronted in Takhalov.

The Takhalov defendants were a group of bar owners who had hired women

to pose as tourists and lure visiting businessmen into the defendants' bars and

nightclubs.  Id. at 1310.  Then bartenders at the clubs would trick the unsuspecting

businessmen into buying ridiculously overpriced alcohol by misrepresenting the

prices of drinks or forging the men's signatures on their credit card receipts.  See

id. at 1310–11.  The defendants admitted that they had hired the "B-girls" to lure

the men into the clubs and that the women did not tell the men that they had been

hired to do so.  Id.  But the defendants denied knowing about the fraud that took

14

place once the men went into the clubs.  Id.  The defendants claimed that as far as they knew, once the men came to the clubs they "got what they paid for."  Id. at 1311.

The Takhalov defendants asked the district court to instruct their jury that "failure to disclose the financial arrangement between the B-girls and the Bar, in and of itself, is not sufficient to convict a defendant" of wire fraud.  Id. at 1314 (brackets and quotation marks omitted).  The district court refused to give that instruction, the government argued that the jury could return a verdict based on that initial trickery alone, and the jury did.  Id. at 1310–11.  We reversed the defendants' convictions.  Id. at 1324.

Our reasoning proceeded in three main steps.  First, we noted that "there is a difference between deceiving and defrauding: to defraud, one must intend to use deception to cause some injury; but one can deceive without intending to harm at all."  Id. at 1312.  Second, that distinction meant that "if a defendant does not intend to harm the victim — to obtain, by deceptive means, something to which the defendant is not entitled — then he has not intended to defraud the victim."  Id. at 1313 (brackets and quotation marks omitted).  And third, "[f]rom that conclusion, a corollary follows: a schemer who tricks someone to enter into a transaction has not 'schemed to defraud' so long as he does not intend to harm the person he intends to trick."  Id.  "[T]his is so," we said, "even if the transaction would not have

15

occurred but for the trick.  For if there is no intent to harm, there can only be a scheme to deceive, but not one to defraud."  Id.

To tell the difference between a scheme to deceive and a scheme to defraud, we instructed courts to look at "the nature of the bargain itself."  Id. at 1313.  And a lie about the nature of the bargain can take two primary forms.  Id.  First, "the defendant might lie about the price (e.g., if he promises that a good costs $10 when it in fact costs $20)."  Id at 1313–14.  Or second, "he might lie about the characteristics of the good (e.g., if he promises that a gemstone is a diamond when it is in fact a cubic zirconium)."  Id. at 1314.  "In each case, the defendant has lied about the nature of the bargain and thus in both cases the defendant has committed wire fraud."  Id.

By contrast, we explained, "if a defendant lies about something else — e.g., if he says that he is the long-lost cousin of a prospective buyer — then he has not lied about the nature of the bargain, has not 'schemed to defraud,' and cannot be convicted of wire fraud on the basis of that lie alone."  Id.  And that is so even if the buyer would not have bought anything but for the lie.  Id. (citing United States v. Shellef, 507 F.3d 82, 108 (2d Cir. 2007) (drawing "a fine line between schemes that do no more than cause their victims to enter into transactions that they would otherwise avoid — which do not violate the mail or wire fraud statutes — and schemes that depend for their completion on a misrepresentation of an essential

16

element of the bargain — which do violate the mail and wire fraud statutes"); United States v. Starr, 816 F.2d 94, 98 (2d Cir. 1987) ("Misrepresentations amounting only to a deceit are insufficient to maintain a mail or wire fraud prosecution. Instead, the deceit must be coupled with a contemplated harm to the victim . . . affect[ing] the very nature of the bargain itself.") (internal quotation marks omitted); United States v. Regent Office Supply Co., 421 F.2d 1174, 1182 (2d Cir. 1970) ("[W]e conclude that the defendants intended to deceive their customers but they did not intend to defraud them, because the falsity of their representations was not shown to be capable of affecting the customer's understanding of the bargain nor of influencing his assessment of the value of the bargain to him, and thus no injury was shown to flow from the deception.").

## B. The District Court's Jury Instructions

With that background in mind, we turn to Waters' contention that the district court erred by refusing to give his Takhalov-based jury instruction. We review that decision only for an abuse of discretion. United States v. Dohan, 508 F.3d 989, 993 (11th Cir. 2007). "The failure of a district court to give an instruction is reversible error where the requested instruction (1) was correct, (2) was not substantially covered by the charge actually given, and (3) dealt with some point in the trial so important that failure to give the requested instruction seriously

17

impaired the defendant's ability to conduct his defense." United States v.

Eckhardt, 466 F.3d 938, 947–48 (11th Cir. 2006).

Waters requested that the district court give this instruction:

> I have just described what is needed to prove a scheme to defraud. However, there is a difference between deceiving and defrauding; to defraud, one must intend to use deception to cause some injury; but one can deceive without intending to harm at all. Put another way, one who defrauds always deceives, but one can deceive without defrauding.
>
> A Defendant schemes to defraud only if he schemes to deprive someone of something of value by trick, deceit, chicane or overreaching. But if a Defendant does not intend to harm the victim — to obtain, by deceptive means, something to which the Defendant is not entitled — then he has not intended to defraud the victim.
>
> Furthermore, a schemer who tricks someone to enter into a transaction has not schemed to defraud so long as he does not intend to harm the person he intends to trick. And this is so even if the transaction would not have occurred but for the trick. For if there is no intent to harm, there can only be a scheme to deceive, but not one to defraud.

(Alterations and quotation marks omitted).

The district court did not abuse its discretion when it refused to give that

instruction. Though composed of quotations from our opinion in Takhalov,

Waters' "proposed instruction was an incomplete statement of the law and would

have confused the jury." United States v. Solomon, 686 F.2d 863, 876 (11th Cir.

1982). The proposal emphasized the requirement that a defendant have the intent

to harm, but it never defined what harm meant. And it introduced the distinction

18

between a scheme to deceive and a scheme to defraud, but it didn't tell the jurors how to tell the difference between them. Without those tools the jury could hardly have been expected to apply our Takhalov decision correctly.

The government pointed all of that out at the charge conference when it asked the district court to supply the missing link in Waters' instruction. The additional language proposed by the government would have instructed the jury that "[t]he 'scheme to defraud,' as that phrase is used in the wire fraud statute, refer[s] only to those schemes in which a defendant lies about the nature of the bargain itself." Doc. 89 at 5–6 (quoting Takhalov, 827 F.3d at 1313). That addition would have enabled the jurors to tell the difference between the two kinds of schemes because it would have defined for them what "harm" means. To recap: In a scheme to deceive, the victim of the lie hasn't been harmed because he still received what he paid for. But in a scheme to defraud, the victim has been harmed because the misrepresentation affected the nature of the bargain, either because the perpetrator lied about the value of the thing (for example, promising something costs $10 when it actually costs $20), or because he lied about the thing itself (for example, promising a gemstone is a diamond when it is actually a cubic zirconium). Takhalov, 827 F.3d at 1313–14. Either way, though, the victim didn't get what he paid for.

19

By not including that distinction, and then not accepting the government's proposal to add it, Waters asked the court to give an incomplete and misleading jury instruction. The court did not abuse its discretion when it deemed the instruction "overly confusing." See United States v. Cooper, 926 F.3d 718, 736 (11th Cir. 2019) (affirming district court's rejection of a defendant's proposed instruction "because it was misleading and confusing") (quotation marks omitted); United States v. Silverman, 745 F.2d 1386, 1396 (11th Cir. 1984) (noting that a district court "is bound to refuse a requested instruction that is incomplete, erroneous, or misleading").

Waters' argument also fails for another reason. Unlike in Takhalov, his proposed jury instruction did not concern a "point in the trial so important that failure to give the requested instruction seriously impaired [his] ability to conduct his defense." Eckhardt, 466 F.3d at 947–48. Recall that Waters had two main theories at trial. The first was that he didn't create the IRS letter and didn't know it was fake when he sent it to Colony. The district court's refusal to give the proposed instruction did not impact the presentation of that theory at all.

Waters' second theory was that the IRS letter "didn't matter" because the "deal was going forward with or without that letter." His attorney made the point this way in his closing argument:

> Did the Langford letter even make any difference, considering what happened over the course of time? We will go over it again, but I think

20

we pretty well established this at trial. . . .  After the Rebecca Langford letter is sent on [December] 16th, minutes later, Larry Selevan, chomping at the bit, says, well, good enough for me.  I am ready to go. Nobody cared about the Rebecca Langford Letter.  Nobody cared about the taxes. . . .  The Langford letter didn't mean squat.  And the reason it didn't mean squat is because of what the witnesses told you.  We wanted the deal to finalize. . . .  Nobody worried about whether the Rebecca Langford letter was authentic.  To use the words of the lawyers, it has to be material.  It has to be important.  It was not important.

As Waters' attorney told the jury, that is an argument about materiality.  The judge explicitly defined that term for the jurors ("A material fact is an important fact that a reasonable person would use to decide whether to do or not do something") and instructed them that to be guilty of wire fraud Waters must have omitted or misrepresented a fact that was material.  See Pattern Crim. Jury Instr. 11th Cir. OI O51 (2016).  So when Waters argued that the false IRS letter was not material because the deal was going forward "with or without that letter," and when he said that the letter did not concern a material fact because "nobody cared about the taxes," his arguments were in accord with the court's instructions.  Of course, the deal did not go forward "with or without that letter" and that may be one reason the jury rejected his argument.  But the jury's rejection of Waters' theory does not mean he was "seriously impaired" in his ability to present that theory to the jury.  Eckhardt, 466 at 948.  He wasn't.

This is materially different from what happened in Takhalov.  Unlike in Waters' case, the jury instruction the Takhalov defendants requested was integral

21

to their argument.  Their argument did not hinge on whether the businessmen still would have gone into the clubs had they known of the true relationship between the B-Girls and the bar owners.  See 827 F.3d at 1310–11.  Instead, the defendants argued that their concealment of their relationship with the B-Girls did not constitute wire fraud, regardless of whether that concealment was material to the businessmen's decisions to enter the clubs.  That is why the defendants asked for this jury instruction: "Failure to disclose the financial arrangement between the B-Girls and the Bar, in and of itself, is not sufficient to convict a defendant of any offense."  Id. at 1311 (alterations omitted).  The Takhalov defendants did not get to present their theory to the jury because the district court rejected their proposed jury instruction that would have put that theory before the jury.  As we explained, "[w]ithout an instruction supporting the defendants' theory, the jury was not required to believe this theory . . . [and] the jury could believe what the government argued in its closing: that the concealment was material and the defendants acted with the intent to deceive or cheat the victims."  Id. at 1322–23.

By contrast, Waters' proposed jury instruction on the difference between fraud and deceit did not propose either of his two defense theories.  As a result, the rejection of his jury instruction did not impair his presentation of a defense theory.  See Eckhardt, 466 F.3d at 947–48 (holding that defendant accused of violating the Communications Decency Act was not impaired by trial court's refusal to alter its

22

jury instruction defining what constituted an "obscene" phone call because defendant's theory of the case was that he did not make the alleged phone calls). Nor did Waters change a theory at trial in response to the court's rejection of his proposed jury instruction, as the Takhalov defendants did.  Not until Waters got to this Court did he argue that his misrepresentations weren't wire fraud because they did not affect the bargain between the parties.  (More on that argument below.)  He did not consent to the government's proposed instruction that would have instructed the jury on that very topic.  Given all of that, the district court did not abuse its discretion when it declined to give Waters' proposed jury instruction.[5]

## C.  Sufficiency Of The Evidence

We turn now to Waters' second Takhalov-based argument: that the district court should have granted his motion for a judgment of acquittal because there was insufficient evidence that he intended to harm Colony.  "Ordinarily, we review de novo whether sufficient evidence supports a conviction, viewing the evidence and taking all reasonable inferences in favor of the jury's verdict."  United States v. Fries, 725 F.3d 1286, 1291 (11th Cir. 2013).  But Waters did not renew his motion

---

[5]  One side point is worth addressing.  At the final charge conference Waters argued that his proposed jury instruction was needed "[b]ecause there is the chance that jurors could think that . . . the failure to include all of the tax liens on . . . the personal financial statement by itself would be sufficient to show fraud."  By not raising this point on appeal Waters has abandoned any argument that the jury found him guilty based on the false financial statement instead of the fraudulent IRS letter and the email Waters sent affirming the IRS letter.  See AT&T Broadband v. Tech Commc'ns, Inc., 381 F.3d 1309, 1320 n.14 (11th Cir. 2004) ("Issues not raised on appeal are considered abandoned.").

23

for acquittal at the close of all the evidence or present to the district court his current theory of why there was insufficient evidence for the jury to find him guilty. Because of his failure to renew the motion, "we will reverse [his] conviction only where doing so is necessary to prevent a manifest miscarriage of justice." Id. (quotation marks omitted). Which means only if we find "either that the record is devoid of evidence of an essential element of the crime or that the evidence on a key element of the offense is so tenuous that a conviction would be shocking." Id. (quotation marks omitted).

Relying on Takhalov, Waters argues that the tax liens were peripheral to the proposed loan transaction and, as a result, any lies about those liens (including the letters he sent about the make-believe payment plan with the IRS) could not constitute wire fraud because they did not affect the bargain between the parties. This is basically a repackaging of his jury charge argument, but with a twist: it relies on the law in the instruction proposed by the government instead of the instruction he suggested.

In Waters' telling, the tax liens merely "went to the integrity of management," and the projected cash flow from the new medical building formed the heart of the bargain. He says that cash flow combined with the $2.4 million "over-collateralization" of the building itself "ensured repayment of the requested

24

Loan in full." And, as a result, "the removal of [the] tax liens was not 'part of the bargain.'"

The jurors heard plenty of evidence that would cause them to disbelieve that theory. For example, Sanchez, Colony's senior vice president, called the discovery of the tax liens "a deal killer" because he did not "want[] to close a transaction with the[] outstanding liens." And even after the folks at Chesterfield Faring convinced Sanchez not to walk away from the deal when he first learned of the liens, he still considered the tax liens a "gating issue" that had to be resolved before he would consider making the loan. As he testified at trial: The liens were "absolutely critical things to resolve before . . . getting even close to approving th[e] loan for closing."

Colony's attorney, Beau Baker, testified to much the same thing. Once he discovered that the tax liens existed, he stopped working on the due diligence and documentation for the loan until the liens could be resolved. He explained to the jury: "[I]f there is a creditor out there, especially a super creditor like the Internal Revenue Service, that creditor could come after your borrower later on or come after the guarantor, and that could put the payment stream that is coming to my client in jeopardy." The attorney representing Waters in the deal, David Gentry, also understood that Colony "required either the tax liens get paid off or that some

25

sort of payment plan be in place with the IRS to pay it off over time" before the loan could be closed.

To all of that, Waters says: Doesn't matter. He argues that Takhalov teaches that there's a difference between a scheme to deceive and a scheme to defraud. And he says defrauding means that the material misrepresentation must affect the nature of the bargain and not something else. Waters points to Takhalov's reasoning that "even if the transaction would not have occurred but for the trick," Takhalov, 827 F.3d at 1313, "a wire-fraud case must end in an acquittal if the jury nevertheless believes that the alleged victims [would have] received exactly what they paid for," id. at 1314 (quotation marks omitted). Purporting to apply that reasoning here, Waters argues that his case should have ended in an acquittal because, as the government itself conceded at sentencing, the collateral was worth $2.4 million more than the amount of the loan.

There are three reasons why Waters' conclusion does not follow from his premise. The first is that it misconstrues the nature of the bargain with Colony. As the government persuasively points out, the bargain was not for Colony to be sucked into a time-consuming and expensive foreclosure to mitigate its losses if Waters was unable to make the payments on the loan. The bargain was to make a solid loan in the first place and to receive loan payments without the threat of outstanding tax liens getting in the way.

26

That theory was supported by lots of testimony at trial. It's why Sanchez described the tax liens as a "gating issue," and why Baker told the jury that he was worried about the liens because they "could put the payment stream that [was] coming to [Colony] in jeopardy." So the jury was free to conclude that Waters' creditworthiness, as the guarantor of the loan with Sondial, affected the value of the transaction and was part of the bargain itself. See United States v. Appolon, 715 F.3d 362, 368–69 (1st Cir. 2013) (holding that misrepresentations in loan applications used "to assess [a] borrower's creditworthiness" were material because they were "capable of influencing [the lender's] decision") (quotation marks omitted); see also United States v. Rossomando, 144 F.3d 197, 201 (2d Cir. 1998) ("[W]here a defendant deliberately supplies false information to obtain a bank loan . . . the defendant's good-faith intention to pay back the loan is no defense because he intended to inflict a genuine harm upon the bank — i.e., to deprive the bank of the ability to determine the actual level of credit risk and to determine for itself on the basis of accurate information whether, and at what price, to extend credit to the defendant.") (footnote omitted).

The second reason why the appraised value of the collateral exceeding the amount of the loan does not render the misrepresentations about the tax liens immaterial is that the appraisal of the collateral did not exist until after the deal with Colony fell through. Waters' misrepresentations to Colony about the tax liens

27

occurred in December of 2013. Colony learned in late January of 2014 that the letter from the IRS was fake. It was at that point that Colony walked away from the deal for good. Waters then courted another company for the loan, and it was that other company, Thorofare, that had the property appraised in April of 2014. The appraisal did not exist when Waters misrepresented the facts about the tax liens, when Colony was considering Waters' loan application, when Colony discovered the misrepresentations, or when it walked away. Something that did not exist at the time of the fraud cannot evidence a lack of intent to defraud.

The third reason why the appraisal cannot figure into the sufficiency of the evidence to prove intent to defraud is that sufficiency is judged based only on the evidence before the jury. When deciding whether there was sufficient evidence to convict, we may not consider evidence the jury never heard. See United States v. DeSimone, 660 F.2d 532, 538–39 (5th Cir. Unit B Nov. 1981). No evidence of the appraisal was ever put before the jury. None. The first time it was mentioned was in Waters' sentencing memoranda, six months after the jury had returned its verdict and gone home. That was six months too late.

## III. THE OTHER ISSUES

Waters has two more contentions, neither of which has merit. First, he contends that the district court committed reversible error by not making an "on-

28

the-record waiver inquiry" about his decision not to testify at trial.[6]  Waters was represented by an able defense attorney whom the trial judge complimented several times for doing a good job.  And Waters acknowledges that there is no "per se requirement that the district court advise the defendant of his right to testify and conduct an on-the-record inquiry into whether a non-testifying defendant knowingly, voluntarily, and intelligently waived the right to testify."  United States v. Van De Walker, 141 F.3d 1451, 1452 (11th Cir. 1998).  So why does he contend that the district court committed reversible error?  Because he was the "only person in a position to refute the prosecution's case," thereby making his situation "exceptional."

---

[6]  The parties disagree about what standard of review applies to this claim.  The government argues that plain error review applies because Waters did not object at trial, and that seems right.  But Waters relies on our decision in United States v. Hung Thien Ly, 646 F.3d 1307, 1318 (11th Cir. 2011), to argue that the standard of review is "unsettled" and that structural error analysis may apply.

In Hung Thien Ly, the pro se defendant failed to object at trial to the district court's failure to correct his misunderstanding of his right to testify.  We rejected the government's argument that we should review only for plain error.  Id. at 1312 & n.5.  We explained: "The Government contends that plain-error review must apply because Ly never objected to the district court's alleged denial of his right to testify.  In the context of Ly's claim, this argument is absurd.  Ly's argument on appeal is that his confusion regarding his right to testify was so apparent during the court-initiated colloquy that the district court was obligated to correct his misunderstanding.  By definition, Ly could not have objected to the district court's actions, for his claim lies in his ignorance of the law."  Id. at 1312 n.5.  Looking at the issue de novo, we held that the district court had erred by not correcting the pro se defendant's misunderstanding of his right to testify, and then we assumed without deciding that harmless-error analysis applied and held that the error was harmful.  Id. at 1318.

There are significant differences between this case and Hung Thien Ly.  The most obvious of them is that Waters was represented by able counsel while the defendant in Hung Thien Ly had no counsel.  But even if we assume that de novo review applies, Waters still cannot prevail on his claim that the district court should have inquired about his decision not to testify.

29

We don't accept that as a ground for relief.  While being in a position to refute the prosecution's case may have been a good reason for Waters to take the stand (though we doubt it's all that "exceptional"), it certainly isn't enough to establish that his decision not to testify was unknowingly and unintelligently made.  See Hung Thien Ly, 646 F.3d at 1317 ("[A]bsent evidence to the contrary, district courts should presume that the defendant, even a pro se defendant, has made a knowing and intelligent decision about whether to testify.").

Second, Waters also contends that the district court made an erroneous factual finding that impacted his sentence.  We normally review the procedural reasonableness of a sentence under an abuse-of-discretion standard, and a court abuses its discretion if it "select[s] a sentence based on clearly erroneous facts." Gall v. United States, 552 U.S. 38, 51 (2007).  Because Waters did not object at the sentence hearing, however, we review the alleged error only for plain error.  See United States v. Vandergrift, 754 F.3d 1303, 1307 (11th Cir. 2014) (using plain error review because defendant failed to object on procedural reasonableness grounds at sentencing).  "Under plain error review, we can correct an error only when (1) an error has occurred, (2) the error was plain, (3) the error affected substantial rights, and (4) the error seriously affects the fairness, integrity or public reputation of judicial proceedings." Dupree v. Warden, 715 F.3d 1295, 1301 (11th Cir. 2013).

30

Waters' contention is based on a comment the judge made at the end of the sentence hearing, after he had announced Waters' six-month sentence:

> I don't think this man is ever going to commit another crime. It may not feel like it, but he got a break. I mean, what a break. If that loan had not been repaid, we are looking at about a five-year sentence, so he got that break.

That was a misstatement. Waters had not paid back a loan to Colony because there never was a loan from Colony to repay. But Waters has not shown that the misstatement constituted a clearly erroneous factual finding because he has not shown that it was a factual finding at all. Earlier in the hearing the district court formally adopted the unobjected-to factual findings in the PSR. Those findings made clear that although Waters had applied for a loan from Colony, he had not received one. The judge said that the fact that Colony had not lost any loaned money "ma[de] a big difference" for sentencing purposes. That is literally true. Viewed in this context, we can't say that the judge's slip up about the loan having been repaid — as opposed to never having been made — was a relevant fact finding instead of a stray comment at the end of a long hearing. And it is one to which there was no objection.

Even if we were to consider the comment a clearly erroneous factual finding, Waters has still not shown that it affected his sentence, as required to establish plain error. See Vandergrift, 754 F.3d at 1312 ("In order for an error to have affected substantial rights, it must have affected the outcome of the district court

31

proceedings.") (quotation marks omitted). According to Waters, the misstatement affected his sentence because it showed that the judge "did not believe that [he] deserved any leniency because he already had received the benefit of the Loan being repaid." But the judge himself gave three reasons for why he thought that Waters *did* deserve leniency: (1) there was no economic harm to Colony, (2) Waters' conduct had otherwise been lawful and upstanding, and (3) Waters had a lot of community support. Not only that, but after the judge had commented at the beginning of the sentence hearing that he did not think that the government's proposed sentence of a year and a day would be long enough, he ended up sentencing Waters to only six months. That indicates the judge had an open mind and gave consideration to Waters' arguments at sentencing. Waters' speculation about a single comment that the judge made *after* he had imposed the sentence is not enough to show that it affected Waters' sentence.

**AFFIRMED.**

32