[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-11799

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

ADAM JOSEPH OWENS,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Alabama
D.C. Docket No. 1:20-cr-00122-TFM-28

_____

Before GRANT, ABUDU, and ED CARNES, Circuit Judges.

GRANT, Circuit Judge:

Adam Joseph Owens was arrested as part of a federal-state task force's investigation into a massive drug ring. He was charged with several crimes but ultimately pleaded guilty to one count, possessing a firearm in furtherance of a drug trafficking crime. The district court imposed 120-months' imprisonment, which doubled the 60-month total recommended by the Sentencing Guidelines. The district court concluded that this upward variance was appropriate for Owens because he had been planning to sell drugs while in jail awaiting sentencing and had also caused the overdose death of one of his buyers. Owens challenges both findings. Because we conclude that they were not clearly erroneous, we affirm his sentence.

**I.**

Owens was one of forty-two defendants charged in a sprawling indictment targeting the Crossley Hills Drug Trafficking Organization. Beginning in 2016, the drug ring dealt heroin, fentanyl, methamphetamine, Xanax, and oxycodone in and around Mobile County, Alabama. Where the drug ring went, overdoses, hospitalizations, and deaths followed—Crossley Hills dealers killed so many unwary customers with fentanyl-laced heroin that their product earned the nickname "Grey Death." Many transactions took place in hotels and motels around Mobile, but dollars were not the only currency. Sexual favors were also in play, and the dealers sometimes even incapacitated female customers with fentanyl-laced drugs so they could take advantage of them. *See*

*United States v. William Owens*, No. 22-12420, 2023 WL 7182353, at *1–2 (11th Cir. Nov. 1, 2023).

Owens was arrested on an outstanding warrant by officers involved in the Crossley Hills investigation. Their search of his vehicle paid off, uncovering several unlabeled pill bottles, over 150 pills (including oxycodone), and a small bag of ecstasy. On top of all that, the officers found two loaded handguns, one of which was stolen from the local sheriff's office. Originally charged in four counts, Owens ultimately pleaded guilty to one—possession of a firearm in furtherance of a drug trafficking crime. As part of his plea, Owens admitted that he had trafficked in opioid-based prescription pills, that the pills were in his vehicle so he could sell them, and that he had possessed the two firearms in his vehicle to further his drug trafficking. In exchange, he got the government's recommendation that he be sentenced to the mandatory minimum for the offense, 60 months in prison.

The arrest, however, had not deterred Owens. The presentence investigation report (PSI), entered during the sentencing process, stated that while Owens was in jail he managed to acquire items including a cell phone and several 8-milligram strips of a narcotic called Suboxone.[1] This combination meant he could keep dealing drugs—even from jail. The PSI also indicated that Owens was linked to the death of at least one of Crossley

---

[1] Suboxone is a controlled substance that may be prescribed by doctors to treat opioid addiction, but it carries serious risk of abuse. *United States v. Abovyan*, 988 F.3d 1288, 1296 (11th Cir. 2021).

Hills's victims.  That man, a buyer the report refers to as B.B., bought oxycodone from Owens on November 30, 2017, and died later that same night.  B.B.'s autopsy showed that he had overdosed on fentanyl and several fentanyl analogues.

At Owens's initial sentencing hearing, the district court specifically highlighted B.B.'s death, along with Owens's apparent efforts to deal drugs from jail, as uniquely troubling.  Explaining that it might depart from the government's recommended sentence of 60 months, the court set a hearing to take evidence on both allegations.

At that second hearing, the court began by adopting the PSI and its 60-month Sentencing Guidelines calculation.  Neither Owens nor the government objected to the PSI; nor did either party challenge the Guidelines calculation.  The district court then heard testimony.

The government first called James Ward to testify about the contraband found in Owens's possession at the jail.  Ward was warden of the Conecuh County Detention Center where Owens had been held, and testified that while watching a cell phone search from a live video feed in his office, he saw Owens remove several items from his hair.  An officer supervising the cell phone search seized the items, turning up a cell phone, a phone charger, cigarettes, earplugs, and Suboxone strips.  All of these were brought to Ward, who emphasized on the stand the difficulties he faced in slowing the drug trade in his jail.

The government next called Mobile Police Sergeant Nicholas Vegliacich to testify about B.B.'s death. He explained that police had found extensive text message history between Owens and B.B., with the last messages between the two dated November 30, 2017—the day of B.B.'s death. They had set up a drug sale, and geolocation data from their phones put them together at the proposed time and place. Six or seven hours later, B.B. was found dead.

Vegliacich also reviewed B.B.'s autopsy report, which listed the cause of death as a fentanyl overdose. Owens had been charged with distributing oxycodone (not fentanyl), and B.B. had arranged to buy oxycodone (not fentanyl). Even so, Vegliacich's testimony connected the drugs Owens sold to B.B.'s death. He explained that the illicit drug market had "a huge problem with counterfeit pills"—specifically, pills that were often laced with fentanyl even though they looked like legitimate oxycodone.

At the close of the hearing, the district court found that Owens had possessed Suboxone for sale while he was in jail and that he had sold B.B. the drugs that caused his death. The court emphasized with frustration that, even while incarcerated, Owens had "continued to flout the drug laws of this country." The court also decried the destructive social harm caused by the illegal trade in prescription opioids and highlighted the public-safety imperative for an increased sentence. B.B.'s death, the court added, was "a powerful factor" that was "not adequately taken into account by the guidelines." Rejecting the government's Guidelines

6                    Opinion of the Court                    22-11799

recommendation of 60 months, the court instead imposed a sentence of 120 months.  Even so, it credited Owens for pleading guilty, and explained that the sentence was a show of mercy because it was lighter than the 30 years the court would ordinarily impose for a drug trafficking case involving the death of a customer.

Owens objected to the court's reliance on its factual findings about the Suboxone and B.B.'s death.  For the former, he argued that the government had not shown that the seized strips were really Suboxone because it did not offer a toxicology report.  For the latter, he said that he could not have caused B.B.'s fentanyl-overdose death because he had only been charged with dealing oxycodone.  The district court overruled both objections and finalized the sentence.  Owens now appeals.

## II.

Defendants can claim procedural error in sentencing even if the overall sentence is substantively reasonable.  *See United States v. Shaw*, 560 F.3d 1230, 1237 (11th Cir. 2009).  Such errors include miscalculating the Sentencing Guidelines range, treating the Guidelines as mandatory, failing to consider the 18 U.S.C. § 3553(a) sentencing factors, relying on clearly erroneous facts, and failing to adequately explain the sentence issued.  *Id.*

We ordinarily review the procedural reasonableness of a sentence for abuse of discretion.  *United States v. Waters*, 937 F.3d 1344, 1358 (11th Cir. 2019).  One way a district court abuses its discretion is if the factual findings it uses in a sentencing

enhancement are clearly erroneous. *Id.* But if a defendant fails to object at the time of sentencing, our review is only for plain error, a much tougher standard. *Id.* To reverse an error raised for the first time on appeal, a defendant must show not only "that the error was 'plain'" but also that it "affected his substantial rights." *United States v. Vandergrift*, 754 F.3d 1303, 1307 (11th Cir. 2014) (alteration adopted) (quotation omitted). Even then, we exercise our discretion to correct an error only if it seriously affects "the fairness, integrity or public reputation of judicial proceedings." *United States v. Turner*, 474 F.3d 1265, 1276 (11th Cir. 2007) (quotation omitted).

This high standard reflects the "careful balance" that must be set "between judicial efficiency and the redress of injustice." *Puckett v. United States*, 556 U.S. 129, 135 (2009). The plain-error rule disincentivizes "sandbagging," where a defendant remains "silent about his objection and belatedly rais[es] the error only if the case does not conclude in his favor." *Id.* at 134. But more fundamentally, requiring a contemporaneous objection gives the district court the first opportunity to consider—and resolve—a defendant's objections, which can often help parties and courts alike "avoid the costs of reversal and a retrial." *Turner*, 474 F.3d at 1275. After all, the district court "is ordinarily in the best position to determine the relevant facts and adjudicate the dispute." *Puckett*, 556 U.S. at 134. But it is often impossible to do so without a party raising an issue or developing a factual record about it. That failure, in turn, can impede this Court's ability to fairly decide the issue on appeal.

### III.

Here, Owens raises two challenges to the district court's decision to vary upward from the Sentencing Guidelines' recommendation based on uncharged conduct. That choice is allowed as a general matter because uncharged conduct can be "directly germane to several § 3553(a) factors," which the court is required to consider when determining a sentence. *United States v. Overstreet*, 713 F.3d 627, 637–38, 638 n.14 (11th Cir. 2013). Those factors include "the 'history and characteristics of the defendant,' and the need for the sentence to 'promote respect for the law,' 'afford adequate deterrence to criminal conduct,' and 'protect the public from further crimes of the defendant.'" *Id*. at 637–38 (quoting 18 U.S.C. § 3553(a)(1)–(2)). The district court's relevant factual findings can be based on "facts admitted by the defendant's guilty plea, undisputed statements in the PSI, or evidence presented at the sentencing hearing." *United States v. Matthews*, 3 F.4th 1286, 1289 (11th Cir. 2021). Reasonable inferences from this evidence are allowed. *Id*.

If a defendant challenges one of the factual bases of the sentence, the government bears the burden of proving that fact by a preponderance of the evidence. *United States v. Philidor*, 717 F.3d 883, 885 (11th Cir. 2013). "A preponderance of the evidence is evidence which is more convincing than the evidence offered in opposition to it." *United States v. Watkins*, 10 F.4th 1179, 1184 (11th Cir. 2021) (en banc) (quotation omitted). "It simply requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence." *Id*. at 1184–85 (quotation omitted).

## A.

Owens first challenges the district court's finding that he possessed Suboxone for distribution while in the county jail awaiting sentencing.  His argument on appeal, however, reaches further than his objection at the sentencing hearing.  There, he objected that the government never produced a toxicology report showing that the confiscated strips were Suboxone—essentially, an argument that while he may have been in possession of *something*, the government had not shown that it was a controlled substance.  On appeal, however, he also contests the predicate finding that he possessed any contraband at all.

We begin with Owens's preserved objection.  Warden James Ward's testimony was the only evidence taken at the hearing on the Suboxone strips.  Ward admitted that he was not sure whether the strips had been tested, but seemed certain that they were Suboxone based on his experience at the jail.  He also explained that the drug trade was a huge problem in his prison, emphasizing that the jail "struggle[d] every day to keep [drugs] out," and that inmates were "making money on cash apps left and right."  For his part, Owens never suggested what else the strips could be *besides* Suboxone.  In fact, his counsel referred to the "Suboxone strips" when asking Ward if they had been tested.

The district court was entitled to make the reasonable inference from this testimony that Ward could recognize, based on his experience and on the circumstances surrounding the search, that the strips seized from Owens were Suboxone.  The court saw

Ward's conclusion as credible, and that finding is entitled to substantial deference—especially considering that Owens offered no contrary explanation for what the confiscated strips might be. *See United States v. Pham*, 463 F.3d 1239, 1244–45 (11th Cir. 2006). Where the government presents unrebutted, credible firsthand testimony and the defendant presents no evidence at all, we do not hesitate to find that, "in light of all the evidence," the government has proved its version of events "is more likely true than not." *Watkins*, 10 F.4th at 1185 (quotation omitted). We find no error.

Owens did not preserve his new challenge—that the district court erred in finding that he possessed any contraband at all (including the strips) in jail—so we review it only for plain error. This challenge likewise fails, again because of Ward's testimony. He explained that in an effort to eliminate illicit cell phones, he had purchased a special cell phone detector for the jail. Ward testified that he observed real-time surveillance video while the inmates waited to walk through the scanner, and that he saw Owens remove several items from his hair—a cell phone, a phone charger, cigarettes, earplugs, and Subxone strips. Ward testified that the items had been dropped off in his office shortly after they were confiscated, but had since been handed over to the state of Alabama. Ward also explained that the jail's surveillance system was live-feed only, meaning no recordings could be maintained.

Owens says Ward's testimony alone is not enough. He objects that the district court needed to view the security camera footage, examine the contraband, or at least hear testimony from

the officer who originally found it. We disagree. Ward's account of the search is clear and logical, and the district court deemed it credible. Again, Owens did not offer any evidence that casts doubt on Ward's testimony. Nor did he offer any evidence at all to rebut that testimony. We find no error, much less plain error.

**B.**

Owens next challenges the district court's finding that he sold the drugs to B.B. that caused his death. As with his attack on the district court's Suboxone finding, Owens preserved only one argument on this front. Below, he objected that he could not have been responsible for B.B.'s fentanyl-overdose death because he was only charged with selling oxycodone. He now adds that the government failed to show that he sold *any* drugs to B.B. on the day in question.

The district court did not clearly err by finding that Owens's drugs caused B.B.'s death. To start, the timing of B.B.'s death points to Owens, who sold B.B. drugs when the two met on November 30, 2017. Six to seven hours later, B.B. was dead of an overdose, with no evidence suggesting that he got drugs from any other source before his death.

The autopsy report's conclusion that B.B. died from a fentanyl overdose does not mean that Owens's oxycodone pills were not the cause of death. To the contrary, it fits the available evidence—Sergeant Vegliacich testified to a "huge problem" with counterfeit oxycodone pills that were contaminated with fentanyl. What's more, the factual background of Owens's PSI, which he did

not challenge, reflected that Crossley Hills dealers regularly cut various drugs with fentanyl—increasing both the drugs' potency and the dealers' profits.　And other unwitting Crossley Hills customers had died from fentanyl overdoses after taking laced drugs from the gang.　These factual allegations offer additional support for the district court's conclusion that Owens was responsible for B.B.'s death, and by failing to object to them in his PSI, Owens admitted them for sentencing purposes.　*United States v. Wade*, 458 F.3d 1273, 1277 (11th Cir. 2006).　We see no error.

As for the unpreserved challenge to the court's finding that Owens sold B.B. any drugs in the first place, once again, we review only for plain error.　And, once again, we find it wanting.　Sergeant Nicholas Vegliacich testified that he personally reviewed "at least 50 pages of text messages" showing constant drug sales from Owens to B.B.　Those communications included messages arranging a sale on the day of B.B.'s death, and geolocation data confirmed that Owens and B.B.'s cell phones were at the prearranged place at the scheduled time.

Owens argues that the district court erred by relying on this hearsay evidence to conclude that he sold drugs to B.B.　But it "is well established in this circuit that the sentencing court may rely on reliable hearsay."　*United States v. Polar*, 369 F.3d 1248, 1255 (11th Cir. 2004).[2]　This cell phone evidence fits the bill.　The district court

---

[2] After oral argument, Owens directed this Court's attention to *United States v. Lee*, 68 F.3d 1267 (11th Cir. 1995), which he argues required the district court to make express findings stating why it found the hearsay evidence reliable.

22-11799                Opinion of the Court                13

did not err, plainly or otherwise, by concluding the government had shown by a preponderance of the evidence that Owens sold B.B. drugs on the day he died.

⋆    ⋆    ⋆

Because the district court's factual findings at sentencing were not clearly erroneous, we **AFFIRM** Owens's sentence.

---

As we have explained before, *Lee* does not always require explicit credibility findings. In cases "where the record and the circumstances of the case demonstrate adequate indicia of reliability, [credibility] findings are not strictly necessary." *United States v. Baptiste*, 935 F.3d 1304, 1316 (11th Cir. 2019) (quotation omitted). The testimony of Sergeant Vegliacich, a law-enforcement officer, about his investigation of Owens exhibits none of the suspicious characteristics we have previously identified as warranting separate credibility findings. *See id.* at 1316–17.