[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-15019; 19-13335

_____

D.C. Docket No. 3:16-cr-00017-MCR-1

UNITED STATES OF AMERICA,

Plaintiff - Appellant,

versus

LARRY L. MASINO,
DIXIE MASINO,

Defendants - Appellees.

_____

Appeals from the United States District Court
for the Northern District of Florida

_____

(July 30, 2021)

Before WILSON, ROSENBAUM, and HULL, Circuit Judges.

WILSON, Circuit Judge:

This is an appeal from a criminal case arising from the operation of a bingo parlor in Fort Walton Beach, Florida.[1]  A jury found Larry and Dixie Masino, the owners and operators of the business, guilty of the following charges: conspiracy to commit wire fraud, operating an illegal gambling business, conspiracy to commit money laundering, and substantive money laundering.  After trial, the district court entered a judgment of acquittal for Larry and Dixie on the conspiracy-to-commit-wire-fraud charge but denied judgment of acquittal on the remaining counts.[2]  The court then sentenced Larry to a prison term of twelve months and Dixie to five years of probation.  They were also ordered to pay a forfeiture money judgment and to forfeit their interests in bank accounts and properties connected to the offenses for which they were convicted.

The government now appeals the judgment of acquittal as to wire-fraud conspiracy.  The Masinos cross-appeal the district court's denial of their motions for judgment of acquittal on the other counts.  They also challenge the court's forfeiture order.  We consolidated the Masinos' appeals with the government's appeal.  After careful review, and with the benefit of oral argument, we affirm the district court in all respects.

---

[1] As defined by Florida law, bingo is a game "in which participants pay a sum of money for the use of . . . bingo cards[,] . . . numbers are drawn by chance," and the player who first "receives a given order of numbers in [a particular] sequence" and "calls out 'bingo' [ ] is declared the winner of a predetermined prize."  Fla. Stat. § 849.0931(1)(a).

[2] Because the defendants share the last name "Masino," we use their first names to avoid confusion.

2

## I.    Background

The defendants in this case are ex-spouses who divorced in 2009.  They were the majority owners of a bingo parlor, Racetrack Bingo Inc., since it opened in 1992.  Larry served as Racetrack Bingo's president until 2011.  Dixie took over at that point, but Larry stayed involved and often advised Dixie on running the business.  This appeal turns on whether Larry and Dixie ran the bingo operation legally and whether they defrauded charities by misrepresenting the operation's legal compliance.  We begin with an overview of the governing statutes.

### A.    The Federal Gambling Statute and the Florida Bingo Statute

It is illegal under federal law to conduct a gambling business which "is a violation of the law of a State or political subdivision in which it is conducted."  18 U.S.C. § 1955(b)(1)(i) (Federal Gambling Statute).  Under Florida law, bingo is not categorically prohibited, but it must be conducted according to the conditions set forth in Florida's Bingo Statute.  *See* Fla. Stat. § 849.0931.  Conducting a bingo operation in Florida that fails to comply with those conditions creates liability under the Federal Gambling Statute for running an illegal gambling business.

The conditions imposed by Florida's Bingo Statute vary depending on the type of organization conducting the bingo games.  Subsection (3) sets the ground rules for noncharitable organizations: they are prohibited from making a profit and must return all bingo proceeds to the players in the form of prizes.  *Id.*

3

§ 849.0931(3).  Subsection (2)(a) sets out the rules for charitable organizations conducting bingo: they are allowed to generate profits, provided "the entire proceeds . . . less actual business expenses for articles designed for and essential to the operation, conduct, and playing of bingo" go to a charitable purpose.  *Id.* § 849.0931(2)(a).  When a charitable organization is conducting bingo, a business can lease a venue to that organization, and the business can turn a profit on the lease—provided the rent is comparable to market value and is not based on a percentage of bingo proceeds.  *Id.* § 849.0931(11)(c).  A charitable organization must conduct bingo through volunteers who are "bona fide" members of the organization.  *Id.* § 849.0931(8).

The Bingo Statute does not define "volunteer" or "bona fide member," and case law is scant.  But one intermediate Florida appellate court has tackled the issue.  *See State v. S. Cnty. Jewish Fed'n*, 491 So. 2d 1183 (Fla. Dist. Ct. App. 1986).  In that case, the court held that whether a volunteer is a bona fide member of a charity has nothing to do with whether the volunteer sincerely cares about the organization's mission; the question is simply whether the volunteer properly enrolled with the organization and paid any required dues.  *Id.* at 1187.  The court also explained that although volunteers cannot receive compensation from the charity, they can receive tips from bingo players.  *Id.*

4

B.    **Racetrack Bingo's Business**

At least on the surface, Racetrack Bingo's business model was to lease space to charitable organizations so that they could conduct bingo games.  Between 2006 and 2015, Racetrack Bingo entered into a series of lease agreements with a group of charities that had organized as Fort Walton Beach Charities LLC (FWBC).[3] Under the lease agreements, the charities would pay Racetrack Bingo to rent space for bingo sessions for a period of one year, with the charities retaining the option to terminate at any time with twenty-four hours' notice.  The lease agreements made the charities responsible for ensuring the bingo operation complied with Florida's Bingo Statute, stating that failure to do so would result in termination of the lease.

An important aspect of the agreements with Racetrack Bingo was that the charities were not just paying for a property on which they could conduct bingo games; they were paying for what the Masinos called a "turnkey" operation, meaning that Racetrack Bingo would provide all the services needed to conduct bingo games.[4]  This arrangement allowed the charities to generate money from bingo without having to run the operation.

---

[3] The charities formed the LLC to streamline their dealings with Racetrack Bingo, but each charity signed individual lease agreements.

[4] Early on, the lease agreements also included an attachment listing each of the services Racetrack Bingo provided, such as janitorial, building management, and security.  Beginning in 2011, the attachment was removed from the lease agreement, so that the particular services were no longer itemized.

As part of the "turnkey" lease, the Masinos oversaw all aspects of Racetrack Bingo. They hired and trained workers and decided what bingo games would be played on a given night. The bingo workers signed up as members of the participating charities and were called "volunteers," but Racetrack Bingo paid them $40–45 per session—compensation that was, at least nominally, only for setup and cleanup. Okaloosa Chief Deputy Sheriff Fred Cobb, who often discussed Racetrack Bingo's legal compliance with the Masinos, indicated that there would be "no problem" with volunteers receiving compensation for setup and cleanup, so long as they were not compensated for conducting bingo games.

Racetrack Bingo also hired "managers in charge" (MIC) to run bingo sessions and paid them $120–140 per session from the bingo proceeds. According to the Masinos, that compensation also was solely for setup and cleanup, but MICs performed a number of duties. They would conduct bingo games and explain the game rules to customers. They would also record total bingo proceeds on worksheets, then subtract the cost of setup and cleanup, supplies, and rent to calculate the remainder to be paid to the charities. These worksheets were sent to the charities each week.

At times, the Masinos adjusted rent prices to ensure that the enterprise was risk-free for the charities. When bingo proceeds did not cover the cost of rent and

6

other expenses, the Masinos would forgive the difference. That way, the charities never lost money from bingo sessions.

Racetrack Bingo was profitable not only for FWBC but also for the Masinos. In a 2011 email, Larry wrote that Racetrack Bingo had averaged 17 percent net income on gross revenue from bingo—only slightly less than the charities' 20.5 percent net income. Over the course of Racetrack Bingo's operation, the business brought in more than $20 million in proceeds. The Masinos made annual salaries of $75,000 and, along with their children, received distributions totaling over $5 million in bingo proceeds between 2006 and 2015.

## C.     The Indictment and Bill of Particulars

A superseding indictment charged the Masinos with: Count 1, conspiracy to commit wire fraud; Count 2, operation of an illegal gambling business; Count 3, conspiracy to commit money laundering; and Counts 4–41, substantive money laundering. Before trial, the defendants filed motions to dismiss all counts. The district court dismissed Count 2 in part, finding that the Federal Gambling Statute applies only to businesses that are categorically illegal under state law, whereas bingo can be conducted legally in Florida. We reversed and remanded that decision, holding that Racetrack Bingo could be an illegal gambling business under the Federal Gambling Statute if the government could prove that the bingo operation failed to comply with Florida's Bingo Statute. *United States v. Masino*,

869 F.3d 1301, 1307 (11th Cir. 2017) ("If, for example, the government can prove that Racetrack Bingo illegally allows charities to sponsor bingo games without their direct involvement or that Racetrack Bingo forfeits its right to conduct bingo by not returning all of the proceeds from those games to the players, then a jury could find that Racetrack Bingo is an illegal gambling business.").

On remand, the government filed a bill of particulars, specifying the state law predicate for the violations of federal law charged in Count 2. The bill of particulars alleged two violations of the Florida Bingo Statute. First, the Masinos ran a for-profit bingo operation and failed to return proceeds to players in violation of subsection (3) of the Bingo Statute. Second, the Masinos violated subsection (2)(a) by failing to allow bingo proceeds, minus actual expenses, to be donated to FWBC for charitable purposes.[5] The Masinos again moved to dismiss all counts. The district court denied the motions and the case proceeded to trial.

## D.    The Trial

The district court summarized the nine-week trial in the following way:

> The main issues at trial turned on whether the Masinos operated Racetrack Bingo as a lawful lessor and vendor by providing a facility

---

[5] The bill of particulars did not mention subsection (11)(c), which requires landlords to charge charities conducting bingo a rental rate that "does not exceed the rental rates charged for similar premises in the same locale." Fla. Stat. § 849.0931(11)(c). The government later explained that it did not charge a violation of subsection (11)(c) because the Masinos' scheme was never to function as landlords and to charge the charities more than market price for the rental space needed to conduct bingo. The government's theory of the case—to the contrary—was that the Masinos were conducting bingo themselves through their employees at Racetrack Bingo and were illegally retaining profits.

and bingo-related services to the charities, or instead operated illegally as a commercial bingo operation by conducting bingo and retaining bingo profits, while using the charities as a cover, contrary to Florida's bingo statute.

To that end, the government called twenty-seven witnesses, including representatives of FWBC charities, law enforcement officials, former Racetrack Bingo employees, and a real estate expert. The government also presented documentary evidence, such as the lease agreements and email communications involving the Masinos.

The evidence at trial showed that the charities' involvement in the bingo operation was minimal for most of the relevant time period. Julie McNabb, the CEO of one of the FWBC charities, testified that her charity would occasionally send someone to observe the bingo games and to make sure the charity's name was posted in the bingo parlor. Early on, the charities were content with this arrangement. But when they learned in 2010 of a criminal investigation into a separate bingo operation that Larry ran in Tallahassee, they became concerned about the legality of Racetrack Bingo. The charities held a meeting to discuss the matter. The meeting minutes reflected the following observations from FWBC members:

- The Bingo statute is very clear, and we are in violation[.]

- The bulk of the money is going to a private individual, which is in direct violation of the statute[.]

- We do not run the operation—it is run by Larry[.]

- We co-mingle our funds which we are not allowed to do by statute[.]

- We rent at an inflated rate versus normal rent for that size building[.]

  . . .

- [The operation] is not being run by volunteers although the runners get tips and a $40 cleaning fee per shift[.]

FWBC had a lawyer, Marty Lester, review the bingo operation and provide an opinion. He noted that "[w]hoever runs the [bingo] games must be bona fide members of the [charity] organization." He also expressed concern that rent seemed to be "not related to market value for commercial property in the area." At the same time, Lester advised that the statute was "open to interpretation."

The charities then met with Larry and asked him whether Racetrack Bingo was complying with the Bingo Statute. Larry insisted that it was. A few weeks later, the charities sent a representative, Tony Mallini, to observe Racetrack Bingo firsthand. Mallini recorded a number of observations, including that MICs make $120 per shift and that floor workers make $45 for setup and cleanup. Mallini reported back to the charities that this process was "adequate," but noted that "[h]aving too many volunteers on the floor is costly to the charities."

Over the next month, the charities continued to raise questions about the compensation of floor workers and MICs at Racetrack Bingo. Via email, Larry assured the charities that Racetrack Bingo paid workers only for setup and cleanup.

10

MICs were paid more money per shift than floor workers, Larry said, because of their increased setup and cleanup responsibilities.

In 2011, after Dixie transitioned into the role of president at Racetrack Bingo, the charities continued to raise concerns about the legality of the bingo operation and the high rent price. Dixie assured the charities that the business did not violate the Bingo Statute, and she insisted that she could justify the rent price. The charities continued to renew the lease agreements with Racetrack Bingo.

But in the summer of 2015, more trouble arose when the IRS audited McNabb's charity. The IRS agent conducting the audit had two main concerns. His first concern was that workers at Racetrack Bingo were not really volunteers. He observed that they knew very little about the charities and that it was illogical to think they were being paid only for setup and cleanup rather than for all of their efforts, including conducting bingo games. McNabb countered that Racetrack Bingo's use of volunteers was legal. She stressed that volunteers can be bona fide members of a charity without knowing much about the charity.

The IRS agent's second concern was that the charities were paying more than market rate for rent. McNabb told the IRS agent that the charities were not just paying for a building—they were paying "for a turnkey operation." To the charities' knowledge, she said, the rate did not exceed what was charged for

11

similar premises "because all of the charities are being grossly overcharged for Bingo."

Only a week later, a federal search warrant was executed at Racetrack Bingo and the Masinos' residences. When the charities met with the Masinos shortly after, in July 2015, the Masinos were concerned that they were facing federal fraud charges—possibly based on misrepresentations they made about business expenses in the itemized attachment to the 2010 lease agreements. Larry asked the charities to write a letter stating that neither he nor Dixie had ever misrepresented Racetrack Bingo's expenses. He said that the expenses listed on the 2010 lease attachment, were "marked up" expenses, and that he had never represented that they were "actual expenses."

The charities did not agree to write a letter on Larry's behalf. They pressed Larry about whether the rent he charged was comparable to market rates. He insisted that it was. At least one FWBC member expressed skepticism, but the charities opted to sign the lease agreements, concluding that Racetrack Bingo was their "only option" if they wanted to keep making money from bingo. A month later, as the federal investigation into the Masinos intensified, the charities finally terminated their relationships with Racetrack Bingo.

At trial, multiple FWBC members testified as to what they might have done had they known that Racetrack Bingo was operating illegally. Several members

testified that they would not have worked with Racetrack Bingo. One member testified that the charities would have continued to participate because Racetrack Bingo was "the proverbial golden goose"; it generated a great deal of revenue without the charities having to expend much effort. Another FWBC member called Racetrack Bingo a "golden opportunity." The proceeds garnered from bingo were particularly valuable to the charities because the money could be appropriated however the charity wished. McNabb explained the point to Dixie in the following way:

> [T]he beauty of [ ] the money that we get from . . . [Racetrack Bingo] is that it's not . . . assigned to anything and so I can use it however I want to benefit my charity.
>
> . . .
>
> I don't have any other funding source as large as yours . . . that doesn't require that I do something very specific with it. So, I do value the money that you give us.

In essence, the charities made money through bingo without expending any effort, and the money came with no strings attached.

The evidence at trial also included testimony from five former Racetrack Bingo employees who began as floor workers and were eventually promoted to be MICs. They testified that they were hired and trained by the Masinos and that they signed noncompete agreements. Under the noncompete agreements, employees were barred from participating in a business similar to Racetrack Bingo's for at

13

least three years after employment.  The employees agreed not to solicit business from Racetrack Bingo's customers during that time.

Finally, the government tendered an expert on Fort Walton Beach real estate prices.  The expert testified that Racetrack Bingo charged rent that was "very high" in comparison to the local market.  A building the size of the Masinos' should rent for about $124,000 annually, the expert testified.  Instead, the Masinos charged over $1 million in rent per year.

The Masinos moved for judgment of acquittal after the close of the government's case in chief.  The court deferred ruling on Count 1; it dismissed the charges on Count 2 except the charges under subsection (3) of the bingo statute (illegally conducting a for-profit bingo operation); and it denied the motions on the remaining counts.  With respect to Count 2, the court reasoned that the charges under subsection (2)(a) of the Bingo Statute should be dismissed because that subsection governed only the conduct of *charitable* organizations conducting bingo, whereas subsection (3) governed the conduct of noncharitable organizations conducting bingo, and Racetrack Bingo was a noncharitable organization.

Next, in the defense's case, Larry testified that was he was acting in good faith and that he believed he was in compliance with the Bingo Statute.  His view of the bingo operation was this: as long as bingo workers were enrolled on the charities' rosters, they were bona fide members of the charities under Florida case

14

law.  *See S. Cnty. Jewish Fed'n*, 491 So. 2d at 1187.  Those workers could be paid for setup and cleanup, and they could receive tips while they operated bingo.  *See id.*  Dixie did not testify at trial.

The case was submitted to the jury.  After deliberations, the jury returned guilty verdicts on all counts: conspiracy to commit wire fraud, violation of the Federal Gambling Statute, conspiracy to commit money laundering, and substantive money laundering.  On Count 1 for conspiracy to commit wire fraud, the court gave the jury a special verdict form to specify the misrepresentations on which they based a guilty verdict.  The form provided:

> *If guilty, identify which of the following that you unanimously find constitute the basis of the verdict:*
>
> ____    The Defendants conspired to fraudulently tell FWBC members that the Defendants were operating Racetrack Bingo in accordance with the Bingo Statute provisions regarding payments to employees conducting bingo games and regarding charging a lease fee comparable to similar locations and services provided in Okaloosa County;
>
> ____    The Defendants conspired to fraudulently tell FWBC members that written breakdowns of expenses provided represented Racetrack Bingo's actual expenses;
>
> ____    The Defendants conspired to fraudulently tell FWBC members and the Okaloosa County Board of Commissioners that Racetrack Bingo's operating expenses were increasing each year to explain why the charities were receiving less money than they had in past years, when in fact, Racetrack Bingo's expenses had decreased.

The jury marked that the misrepresentations described in the first paragraph—relating to compliance with the Bingo Statute's provisions governing

15

employee pay and rent—were the basis for the guilty verdict; the jury did not find that the Masinos made the misrepresentations described in the second and third paragraphs.

### E.    Post-Trial Motions and Sentencing

Post-verdict, the court ruled on the Masinos' renewed motions for judgment of acquittal as a matter of law.  It granted the motions as to Count 1 and denied the motions as to the other counts.  The court explained that it granted judgment of acquittal on Count 1 because the government had not proved that the Masinos intended to defraud the charities by taking the charities' money or property. FWBC paid Racetrack Bingo no more than the amount the lease agreement required.  In return, they got what they bargained for: the agreed-upon proceeds from a bingo operation run by the Masinos without the charities' involvement.

For the convictions on Counts 2–41, the court sentenced Larry to twelve months in prison, followed by two years of supervised release, and Dixie to five years of probation.  The court also ordered that the Masinos pay a forfeiture money judgment of $5,813,584.  The government appeals the grant of judgment of acquittal on Count 1.  The Masinos cross-appeal the denial of judgment of acquittal on Counts 2–41, as well as the forfeiture order.

16

## II.    Discussion

### A.    Standard of Review

We review de novo whether sufficient evidence supported a jury's guilty verdict, viewing the evidence in the light most favorable to the government and "accepting all reasonable inferences and credibility determinations made by the jury." *United States v. McLean*, 802 F.3d 1228, 1233 (11th Cir. 2015).  Regarding the district court's forfeiture order, we review the court's legal conclusions de novo and its finding of fact for clear error.  *United States v. Puche*, 350 F.3d 1137, 1153 (11th Cir. 2003).  Whether a forfeiture order is constitutionally excessive under the Eighth Amendment is also subject to de novo review.  *Id.*

### B.    Illegal Gambling Business (Count 2)

The Masinos argue that insufficient evidence supported the guilty verdict on Count 2 for illegally conducting for-profit bingo games.  The record shows, however, that the jury's verdict was supported by sufficient evidence.  There was evidence, for example, that the Masinos were in charge of staffing the bingo parlor and determining which bingo games would be played each session.  The Masinos also controlled bingo proceeds, adjusting "rent" prices based on how much revenue the bingo sessions brought in.  They even had their employees sign noncompete agreements which prohibited employees from soliciting business from Racetrack Bingo's customers and clients.  Based on this evidence, a reasonable jury could

17

have found that the Masinos were not functioning solely as landlords; they were conducting bingo. As a noncharitable organization conducting bingo games, they were prohibited from retaining any profits; all proceeds had to be returned to the players in the form of prizes. *See* § 849.0931(3). Instead, the Masinos profited millions of dollars in violation of subsection (3) of the Bingo Statute.

The Masinos' central argument on appeal is that they did not "willfully and knowingly" violate subsection (3). They stress that the Bingo Statute is confusing, especially as to whether the Masinos were "conducting bingo" through their employees. Larry argues that he relied on *State v. South County Jewish Federation* and that, under that decision, Racetrack Bingo's workers were bona fide members of the charities. As a result, Larry had a good faith belief, he says, that Racetrack Bingo could legally rent out space to the charities and make a profit as a landlord without actually conducting bingo. Dixie argues that she was largely uninvolved in the bingo business and maintains that the government did not present evidence of her intent to violate the Bingo Statute.

Although the Federal Gambling Statute does not itself require the government to prove that violations were willful and knowing, the Florida Bingo Statute does. *See* Fla. Stat. § 849.0931(14). Because the Florida Bingo Statute is the predicate for the federal gambling violation charged in Count 2, both parties

18

assumed throughout this case that the government had to prove that heightened level of mens rea. We assume the same for the purposes of this appeal.

Nevertheless, the Masinos' argument fails because a reasonable jury could have inferred that the violations were willful and knowing. There was evidence that the Masinos knew that (1) Racetrack Bingo, a noncharitable organization, could not conduct bingo for profit; and (2) it did conduct bingo for profit.

First, while the Bingo Statute may be confusing, it makes clear, at a minimum, that it is illegal for a noncharitable organization to conduct bingo for profit. *See id.* § 849.0931(3). Both Larry and Dixie kept copies of the Bingo Statute, and they discussed the statute over email. Larry even claimed to be an expert on the Bingo Statute, touting that he knew more about it than anyone in Northwest Florida. So a reasonable jury could have found that the Masinos knew they were not allowed to conduct bingo for profit.

Second, there was evidence that the Masinos knew that they were in fact conducting bingo. For instance, Larry sent the following email to Dixie in May 2015: "Something has happened to our business at [Racetrack Bingo]. Somehow the nonprofit groups have taken over and are now in charge of our business, a business which they know nothing about. That spells disaster to me." Based on this email, a reasonable jury could have found that the Masinos' aim was to control

19

the bingo operation rather than to merely rent space in which the charities would conduct bingo.

Furthermore, reliance on Florida case law does not establish that the Masinos acted in good faith.  To be sure, under *South County Jewish Federation*, the Racetrack Bingo volunteers could be bona fide members of the charities simply by signing up on the charities' rosters—their subjective intent for joining the charities is irrelevant.  *See* 491 So. 2d at 1187.  The workers could also receive tips without compromising their volunteer status.  *Id.*  As the district court found, however, *South County Jewish Federation* does not help the Masinos.  That case involved a charitable organization conducting bingo through its volunteers.  *Id.* at 1184.  The difference here is that, even if the workers were bona fide members of the charities, the charities did not control the bingo operation or the proceeds of the bingo operation—Larry and Dixie did.

Nor does Larry's testimony that he acted in good faith change the outcome. The jury was entitled to make a credibility determination and reject that testimony.

The bottom line is that the jury concluded, based on the evidence, that the government proved beyond a reasonable doubt that the Masinos willfully and knowingly violated subsection (3) of the Bingo Statute.  Because the evidence supports that conclusion, the district court correctly denied judgment of acquittal on that count.

20

### C.    Conspiracy to Commit Wire Fraud (Count 1)

Next, we turn to Count 1.  On this count, the government argues that the district court erred in granting judgment of acquittal because the jury's guilty verdict was supported by sufficient evidence.

To convict a defendant of conspiracy to commit wire fraud under 18 U.S.C. § 1349, the government must prove: "(1) a conspiracy to commit [wire fraud]; (2) knowledge of the conspiracy; and (3) that [the defendant] knowingly and voluntarily joined the conspiracy."  *United States v. Feldman*, 931 F.3d 1245, 1257 (11th Cir. 2019) (first alteration in original).  The elements of wire fraud are set out in 18 U.S.C. § 1343: that the defendant (1) "devised or intend[ed] to devise any scheme or artifice to defraud"; and (2) "transmit[ted] or cause[d] to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice."  *Id.*

Although the statute does not define a "scheme or artifice to defraud," we recently held that the government must prove more than an intent to *deceive* in order to prove an intent to *defraud*.  *United States v. Takhalov*, 827 F.3d 1307, 1312–13 (11th Cir. 2016).  To prove an intent to defraud, there must be an intent to harm, which means "to obtain, by deceptive means, something to which [one] is not entitled."  *Id.*  In distinguishing between a scheme to deceive and a scheme to

defraud, we consider whether the defendant "lie[d] about the nature of the bargain itself." *Id.* A defendant can lie about the nature of the bargain by lying about the price or the characteristics of the good. *Id.* at 1313–14.

Here, the conviction on Count 1 turns on whether the evidence supported a finding that the Masinos fraudulently misrepresented their compliance with two provisions of the Bingo Statute: one regarding payments to employees and another regarding rent prices. The court granted judgment of acquittal on Count 1 because it found that even if there was evidence that the Masinos conspired to *deceive* the charities regarding their compliance with the specified provisions of the statute, there was no evidence that the Masinos conspired to *harm* the charities by taking from them money or property to which the Masinos were not entitled. We agree with the district court's analysis and conclusion.

There was evidence at trial that the Masinos made misrepresentations regarding employee compensation and rent payments. As to employee compensation, although it was no secret that floor workers made $40–45 per session or that MICs made $120–140 per shift, the Masinos repeatedly promised the charities that the pay was only for setup and cleanup—not for conducting bingo. A reasonable jury could have inferred, based on the evidence, that these representations were false because the employees were in fact compensated for conducting bingo.

22

Likewise, as to rent payments, there is evidence that the Masinos intended to deceive the charities about compliance with the Bingo Statute's subsection (11)(c) governing rental rates. Under that subsection, bingo games can be held on leased premises, so long as the rent is not based on a percentage of bingo proceeds and "does not exceed the rental rates charged for similar premises in the same locale."[6] Fla. Stat. § 849.0931(11)(c). The government presented evidence that the Masinos assured the FWBC charities that they were compliant with the Bingo Statute, that they were not overcharging for rent, and that their rent was comparable to similar locations, such as the Okaloosa Convention Center. Those assurances were contradicted by a real estate expert who testified at trial that the Masinos charged rent that was higher than comparable leases in the local area. As a result, a reasonable jury could have found that the Masinos conspired to deceive the charities about compliance with (11)(c).

We note that the Masinos' conspiracy was transparent to the victims; the evidence showed that members of FWBC largely knew exactly what was going on.

---

[6] Subsection (11)(c) was a point of confusion at trial. As the government explained to the district court, its theory was always that Racetrack Bingo—a noncharitable organization—was itself conducting bingo. Under that theory, subsection (11)(c) was inapplicable, so the government did not attempt to prove a substantive violation of that provision. However, that subsection was the predicate for the wire-fraud conspiracy charged in Count 1. Even if subsection (11)(c) did not actually apply because the Masinos were the ones conducting bingo, the government presented evidence that the Masinos conspired to create the facade that the charities were the ones conducting bingo—such that subsection (11)(c) would apply—and to misrepresent their compliance with that subsection.

23

But the government did not need to prove that the victims were actually tricked—or even that a person of ordinary prudence would have been tricked by the defendants' scheme. *See United States v. Svete*, 556 F.3d 1157, 1166–69 (11th Cir. 2009) (en banc).

The government did need to prove, however, that the Masinos conspired to do more than deceive the charities; the government had to present evidence from which a reasonable jury could conclude that the Masinos conspired to *harm* the charities by deceiving them about the bargain itself. *See Takhalov*, 827 F.3d at 1313.

There was no such evidence. The charities' profits consisted of total bingo proceeds minus expenses such as payments to bingo workers and the rent specified in the lease agreements. There was no evidence of a conspiracy to mislead the charities about what the charities would receive in that bargain. Indeed, on the special verdict form, the jury did *not* find that the Masinos conspired to misrepresent their business expenses to the charities. The conspiracy, rather, was aimed at misrepresenting whether employee compensation was solely for setup and cleanup, and whether the agreed-upon rent prices aligned with that of comparable locations in the local market. To support the jury's guilty verdict, there would have to be evidence that these deceptions would affect the price or the characteristics of the good being exchanged. *See id.* at 1313–14.

24

We agree with the district court that these deceptions would not have done so. There was no evidence that the Masinos ever collected—or conspired to collect—a penny more than the charities agreed to pay in the annual lease agreements. Racetrack Bingo agreed to lease its premises to the charities and to provide services to facilitate the bingo operation. In return, the charities agreed to pay Racetrack Bingo a specified sum per bingo session. The misrepresentations alleged in this count did not alter that exchange. Racetrack Bingo leased its premises to the charities and provided the services it promised, for which the charities paid the agreed-upon price. Whether the specified misrepresentations about employee compensation and rent induced the charities to enter the lease agreements is irrelevant to whether the Masinos had the requisite intent to harm. *See id.* ("[A] schemer who tricks someone to enter into a transaction has not 'schemed to defraud' so long as he does not intend to harm the person he intends to trick. And this is so even if the transaction would not have occurred but for the trick."). Therefore, the evidence did not support a finding that the Masinos' conspiracy included an intent to defraud the charities; it supported only an intent to deceive the charities through misrepresentations that did not affect the value of the bargain. Accordingly, we affirm the district court's judgment of acquittal on that count.

**D.     Substantive Money Laundering and Money-Laundering Conspiracy (Counts 3–41)**

We now address the remaining counts on which the Masinos were convicted: substantive money laundering and conspiracy to commit money laundering.  We start with the substantive counts.

Federal law prohibits knowingly engaging in "a monetary transaction in criminally derived property of a value greater than $10,000 [that] is derived from specified unlawful activity."  18 U.S.C. § 1957(a).  Here, the substantive money-laundering charges, Counts 4–41, are predicated on the Masinos' convictions under Count 2.  Based on that conviction, Racetrack Bingo was an illegal gambling business.  As a result, the bingo proceeds were "criminally derived property."  *See id.*  The evidence showed that the Masinos then engaged in "monetary transaction[s]" with that money.  *See id.*  Specifically, the Masinos conducted transactions with ill-gotten funds when they deposited profit checks of their illegal gambling business in various banks and financial institutions.  The evidence was thus sufficient to support the jury's guilty verdicts for substantive money laundering.

The evidence also supported the jury's guilty verdict for conspiracy to commit money laundering, Count 3.  The Masinos argue that there was insufficient evidence to support this count because conspiracy requires an agreement between two people, whereas Larry acted largely unilaterally and without Dixie's input.

26

However, the evidence showed that Dixie was not a passive bystander. Larry and Dixie were equal owners in Racetrack Bingo and took turns running the business. Dixie became president in 2011 and often relied on Larry's advice while occupying that role. As relevant here, the government presented evidence of emails between Larry and Dixie in which they discussed when to distribute Racetrack Bingo profits. Also in evidence were checks signed by the Masinos to deposit the proceeds of the illegal bingo operation. Based on this evidence, a reasonable jury could have inferred that Larry and Dixie conspired to launder money as charged in Count 3.

### E.    Forfeiture

Before sentencing, the district court entered a preliminary order of forfeiture and entered a money judgment in the amount of $5,813,584 against the Masinos jointly and severally.

When the government seeks forfeiture of specific property in connection with criminal offenses, it must establish that there is a nexus between the property and the offense. Fed. R. Crim. P. 32.2(b)(1)(A). Provided the government gives notice in the indictment, and "the defendant is convicted of the offense giving rise to the forfeiture, the court shall order the forfeiture of the property as part of the sentence in the criminal case." 28 U.S.C. § 2461(c). The court's forfeiture order must be in accordance with the procedures set forth in 21 U.S.C. § 853. *Id.*

27

Section 853(n) outlines the procedures for resolving a third party's interest in forfeited property. 21 U.S.C. § 853(n).

In the superseding indictment, the government gave notice that it sought forfeiture of the Masinos' assets pursuant to several federal statutes, including 18 U.S.C. § 981(a)(1)(C) (forfeiture in relation to proceeds from "specified unlawful activity"), § 982(a)(1) (forfeiture in relation to money laundering), and § 1955(d) (forfeiture in relation to illegal gambling proceeds). Following the guilty verdicts on Counts 2–41, the government moved for the issuance of a forfeiture money judgment relating to several bank accounts and properties. The Masinos waived their right to have the jury determine the issue of forfeiture, and the court held an evidentiary hearing on the matter. At the hearing, an IRS Special Agent testified that each property and bank account interest was traceable to Racetrack Bingo.

The district court found that the government showed the requisite nexus between the properties and the offenses—pursuant to at least one statutory ground for each asset. Accordingly, the court ordered that the Masinos forfeit each of the property items at issue.

The Masinos argue on appeal that the court erred in issuing its forfeiture order. In particular, Dixie argues that two of the assets at issue—her Baisden Road home in Pensacola, Florida, and her Regions Bank Individual Retirement Account—should not be subject to forfeiture because she acquired those assets

28

before she became closely involved with Racetrack Bingo.  Relying on 21 U.S.C. §

853(n)(6), Dixie argues that she was "a bona fide purchaser for value of the right,

title, or interest" in property who "was at the time of purchase reasonably without

cause to believe that the property was subject to forfeiture."  21 U.S.C. §

853(n)(6)(B).

That provision, however, applies only to "[a]ny person, other than the

defendant," who is "asserting a legal interest" in the property at issue.  *Id.*

§ 853(n)(2).  Dixie does not fit within this provision because she is not a person

"other than the defendant."  *Id.*  She herself was convicted of the offenses that

triggered forfeiture, and the district court found that the assets were traceable to the

illegal gambling business and money laundering activities.  Therefore, this

argument fails.

The Masinos also argue that the Eighth Amendment bars the forfeiture order

and money judgment of $5,813,584 because it is disproportionate to their conduct.

Again, we disagree.  A forfeiture violates the Eighth Amendment only if it "is

grossly disproportional to the gravity of a defendant's offense."  *United States v.*

*Dicter*, 198 F.3d 1284, 1292 (11th Cir. 1999).  "If the value of the forfeited

property is 'within the range of fines' authorized by Congress and the USSC, 'a

strong presumption arises that the forfeiture is constitutional.'"  *Id.*  Here, the

forfeitures did not exceed the authorized maximum fine for money laundering,

which was no more than "twice the amount of the criminally derived property involved in the transaction." 18 U.S.C. § 1957(b)(2). The evidence showed that Racetrack Bingo brought in millions of dollars in illegal bingo proceeds during the relevant time period, and the district court found that the Masinos laundered over $8 million of those proceeds. Based on this unlawful conduct, we cannot say that the forfeiture order and money judgment were grossly disproportionate to the gravity of the offenses. Therefore, we affirm the judgment of the district court.

**AFFIRMED.**

HULL, Circuit Judge, concurring in part and dissenting in part:

I join in full Sections I and II(A), (B), (D), and (E) of the Majority Opinion. However, I am unable to join Section II(C) that affirms the district court's post-verdict entry of a judgment of acquittal on the wire fraud conspiracy charged in Count 1. I would uphold the jury's guilty verdict on the wire fraud conspiracy conviction in Count 1 and reverse the post-verdict acquittal on Count 1. As I see the record, the government presented sufficient evidence that the Masinos devised and engaged in "a scheme to defraud" as that phrase is used in the wire fraud statute and has been interpreted in United States v. Takhalov, 827 F.3d 1307, 1312-1314 (11th Cir. 2016). I discuss Takhalov, the Majority Opinion, and then how Takhalov should be properly applied to the evidence here.

**Takhalov**

Takhalov "makes clear that a defendant 'schemes to defraud' only if he schemes to 'depriv[e] [someone] of something of value by trick, deceit, chicane, or overreaching. But if a defendant does not intend to harm the victim—'to obtain, by deceptive means, something to which [the defendant] is not entitled'—then he has not intended to defraud the victim." Id. at 1312-13 (citation omitted, alterations in original) (quoting United States v. Bradley, 644 F.3d 1213, 1240 (11th Cir. 2011)). "For if there is no intent to harm, there can only be a scheme to

31

deceive, but not one <u>to defraud</u>." <u>Id.</u> at 1313. "Thus, a 'scheme to defraud,' as that phrase is used in the wire-fraud statute, refers only to those schemes in which a defendant lies about the nature of the bargain itself." <u>Id.</u>; <u>see also</u> <u>United States v. Waters</u>, 937 F.3d 1344, 1352 (11th Cir. 2019).

Such lies take two primary forms: (1) a "lie about the price (<u>e.g.</u>, if he promises that a good costs $10 when it in fact costs $20)"; or (2) a "lie about the characteristics of the good (<u>e.g.</u>, if he promises that a gemstone is a diamond when it is in fact a cubic zirconium)." <u>Waters</u>, 937 F.3d at 1352 (quotation marks omitted); <u>Takhalov</u>, 827 F.3d at 1313-14. "In each case, the defendant has lied about the nature of the bargain and thus in both cases the defendant has committed wire fraud." <u>Takhalov</u>, 827 F.3d at 1314.

However, a lie about something else is not a lie about the nature of the bargain, and the defendant has not "schemed to defraud" within the meaning of the wire fraud statute. <u>Id.</u> "And that is so even if the buyer would not have bought anything but for the lie." <u>Waters</u>, 937 F.3d at 1352. In other words, there is a "fine line" between a scheme that merely causes the victim to enter into a transaction the victim would otherwise avoid and one that depends for its completion on "a misrepresentation of an essential element of the bargain." <u>Takhalov</u>, 827 F.3d at 1314 (quoting <u>United States v. Shellef</u>, 507 F.3d 82, 108 (2d Cir. 2007)).

**Majority Opinion**

The Majority Opinion agrees that "the evidence supported a finding that the Masinos fraudulently misrepresented their compliance with two provisions of the Florida Bingo Statute: one regarding payments to employees and another regarding rent prices." Maj. Op. at 22. The Majority concludes that, "even if there was evidence that the Masinos conspired to *deceive* the charities regarding their compliance with the specified provisions of the statute," there was no evidence of a conspiracy "to *harm* the charities" or to "mislead the charities about what the charities would receive in that bargain." Id. at 22, 24. The Majority stresses that "[t]here was no evidence that the Masinos ever collected—or conspired to collect—a penny more than the charities agreed to pay in the annual lease agreements." Id. at 25. The Majority therefore concludes that "the evidence did not support a finding that the Masinos' conspiracy included an intent to defraud the charities; it supported only an intent to deceive the charities through misrepresentations that did not affect the value of the bargain." Id.

**Proper Application of Takhalov**

In my view, the Majority's assertion that there was no scheme to defraud—that is, that the charities got exactly what they bargained for—misconstrues the

33

"nature of [the Masinos'] bargain" with the charities.[1] See Takhalov, 827 F.3d at 1313-14. The bargain was not for the charities to be used as cover while the Masinos illegally conducted bingo for profit and then shared the proceeds with the charities. The bargain was for a legitimate charitable bingo operation, one that complied with Florida's Bingo Statute. The Masinos repeatedly, and falsely, assured the charities that that was what they were getting by entering into the turnkey leases. In particular, the Masinos repeatedly assured the charities that their use of paid "volunteers" to conduct the bingo and their charging an annual rent of over $1 million complied with the Florida Bingo Statute's employee compensation and comparable market rent provisions, knowing that those assurances were false. In short, the Masinos fraudulently misrepresented that Racetrack Bingo was

_____

[1] The Majority Opinion well recounts the facts. I would add only a few more. Racetrack Bingo's building was owned by the defendants in the name of DixLar, Inc., a separate for-profit corporation. DixLar was owned by the defendants and their three adult children, the same shareholders who owned Racetrack Bingo. The government's expert opined that the amount of rent Racetrack Bingo paid to DixLar was "generally high." During the period of the charged conspiracy, the FWBC charities paid approximately $11 million over market value in rent to Racetrack Bingo. Racetrack Bingo's inflated lease rate allowed the defendants to pay themselves a $75,000 annual salary, and to distribute over $5 million in profit distribution checks to themselves and their children between 2006 and 2015. In addition to salaries and profit distributions, the defendants used Racetrack Bingo's corporate account to pay for their and their children's personal expenses. Out of the more than $20 million in gross bingo proceeds Racetrack Bingo brought in, over $8 million was paid to the Masino family after expenses, employee wages, and retirement contributions.

While the Masinos disclosed the rent amounts in the lease agreements, they knew that the rent was well above market value and that they were operating as an illegal for-profit bingo hall through which they reaped huge profits (to the detriment of the charities). While I do not rely on that particular financial harm, it does underscore how the charities did not receive what they bargained for—a legal charitable bingo operation.

34

complying with the provisions of the Florida Bingo Statute relating to employee pay and rent.

Moreover, there was ample trial testimony that the legality of the Masinos' bingo operation was "an essential element of the bargain." See id. at 1314. The charities, whose public reputations were on the line, would not have knowingly entered into turnkey leases that violated the Bingo Statute. Indeed, it was a matter of concern for the charities that the Masinos' turnkey bingo operation comply with the law. As those concerns grew, the charities repeatedly sought assurances from the Masinos that the turnkey bingo operation the charities were paying for out of their share of the bingo proceeds complied with Florida law as to both the compensation of the "volunteers" and the rent amounts in the leases. From this evidence, the jury could conclude that the turnkey bingo operation's compliance with the Florida Bingo Statute "affected the value of the transaction and was part of the bargain itself." See Waters, 937 F.3d at 1357 (concluding, similarly, that the defendant's lies about outstanding tax liens affected the value of a loan transaction and were part of the bargain itself even though the defendant was over-collateralized because "the bargain was to make a solid loan in the first place and to receive loan payments without the threat of outstanding tax liens getting in the way").

35

In sum, the evidence showed the Masinos did not merely induce the charities to enter into the turnkey leases by lying to them. They also gave the charities exactly what the charities did not want and were trying to avoid—an illegal noncharitable bingo operation. In essence, the Masinos promised the charities a diamond while fully intending to deliver a cubic zirconium. See id. at 1352; Takhalov, 827 F.3d at 1313-14.[2] The bargain here was for a nonprofit, charitable bingo operation, whereby, after rent and expenses legally allowed by the Bingo Statute, all proceeds went to the charities. The charities did not receive all proceeds after the deduction of legal rent and expenses. Yes, the charities knew the rent amounts in the leases, but they did not know those rent amounts were illegal under the Florida Bingo Statute. A victim's lack of diligence about the real estate market is irrelevant. See United States v. Svete, 556 F.3d 1157, 1164-67 (11th Cir. 2009) (holding that the statutory phrase "any scheme or artifice to defraud" includes schemes to deceive both the prudent and the negligent).

Accordingly, I would reverse the district court's entry of a judgment of acquittal as to Count 1.

---

[2]As this Court noted in Waters, one of our colleagues "has questioned some of the statements" in Takhalov. 937 F.3d at 1351 (citing United States v. Feldman, 931 F.3d 1245, 1265-74 (11th Cir. 2019) (W. Pryor, J., concurring)). However, as in Waters, "[w]e need not get into that here" because the Masinos' false assurances that their use of "volunteers" and their turnkey rental rates complied with Florida's Bingo Statute were lies "about the nature of the bargain itself." See id. at 1351, 1354; Takhalov, 827 F.3d at 1313.